Frank Dippolito
223 Oriental Ave.
Atlantic City, NJ 08401
Tele: 856 226 3600
      Plaintiff, *pro se*



RECEIVED

APR 0 9 2014

AT 8:30_____
WILLIAM T. WALSH ──M
CLERK

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

FRANK DIPPOLITO
      plaintiff

vs.

THE UNITED STATES OF AMERICA;
THE FEDERAL BUREAU OF PRISONS(FBOP);
ERIC H. HOLDER, Jr., U.S. Attorney
General; HARLEY LAPPIN, Former FBOP
Director; CHARLES E. SAMUELS, JR.,
Former FBOP Director; JOE NORWOOD,
FBOP NORTHEAST Regional Director;
KATHLEEN M. KENNY, FBOP Asst.
Director of General Counsel;
JOHN/JANE DOE 1, FBOP Dir. of
Correctional Programs; MR. D.SCOTT
DODRILL, FBOP Asst. Dir. of
Correctional Programs; JOYCE CONLEY,
FBOP Asst. Dir. of Correctional
Programs; DONNA ZICKEFOOSE, Warden,
FCI Fort Dix; JORDAN HOLLINGSWORTH,
Warden, FCI Fort Dix; CAPTAIN JANEL
FITZGERALD, FCI Fort Dix; MR. HUTCHENS
FBOP Regional Safety Director;
MR. HOLDREN, FCI Fort Dix Safety
Director; MR. G. LAWHORN, CHRISTINE
Y. DYNAN, JACQUILINE NICHOLS, ROBERT
HAZELWOOD, MR. H. SUTHERLAND, FCI Fort
Dix Assoc. Wardens; Mr. Thomas
MCGLOUGHLIN, United States Inspector
General for BOP; MIKE CARROLL, FCI Fort
Dix Unit 6 Unit Manager; MR. ROBINSON,
FCI Fort Dix Unit 6 Unit Manager;
MR. K. BULLOCK, MS. ALEXANDER, FCI Fort

CIVIL COMPLAINT
DOCKET NO. 1:13 CV-00175
    (RBK-JS)

)
) **FIRST AMENDED**
) **COMPLAINT FOR**
) **VIOLATIONS OF THE**
) **FIFTH AND EIGHTH**
) **AMENDMENTS TO THE**
) **CONSTITUTION OF THE**
) **UNITED STATES (BIVENS**
) **V. SIX UNKNOWN NAMED**
) **AGENTS OF FEDERAL**
) **BUREAU OF NARCOTICS; 42**
) **USC §1983); THE FEDERAL**
) **TORT CLAIMS ACT (FTCA);**
) **THE RACKETEER INFLUENCED**
) **CORRUPT ORGANIZATIONS**
) **ACT (CIVIL RICO)**
)
)
) **DEMAND FOR JURY TRIAL**
)
)
)
)
)
)
)
)

1

```
Dix Unit 6 Case Managers; MR. HARWICK   )
FCI Fort Dix Cook Supervisor; OFFICER   )
YEOMAN, FCI Fort Dix 5800 Block Tool    )
Room Officer; OFFICER DANIELS, FCI      )
Fort Dix, 5800 Block Compound Officer;  )
HARRELL WATTS, FBOP Central Office       )
Administrator; MR. LEMYRE, FCI Fort.     )
Dix 5800 Block facilities Director;      )
MR. DONAHUE, FCI Fort Dix, Unit 6 Case   )
Manager Coordinator; MR. CROKER, Food    )
Services Administrator, 5840 Kitchen;    )
OFFICER SMEYLK, FCI Fort Dix 5800        )
Block Facilities Officer; LIEUTENANT     )
ANDERSON, FCI Fort Dix; JAMES A.         )
GONDLES JR., Executive, Director,        )
Director, The American Correctional      )              )
Association; AMERICAN                     )
CORRECTIONAL ASSOCIATION,                )
```
Defendants

## **PLAINTIFF'S FIRST AMENDED COMPLAINT**

This complaint was originally filed when Plaintiff was still incarcerated at FCI Fort Dix, and for reasons that are apparent in the record, he was given leave to file his First Amended Complaint by Order of the Court dated _____, 2013.

## **INTRODUCTION**

1. It is clear from the information presented in this complaint that the defendants in this case have acted with actual knowledge and deliberate indifference to the safety and health of the prisoners at Federal Correctional Institution Fort Dix, New Jersey. Prison authorities have long been aware of the significant and serious risks to prisoner safety and health that

2

are delineated in this complaint. Prison authorities have deliberately chosen to ignore these serious risks to prisoner health and safety. Prison authorities have deliberately chosen NOT to remedy the "toxic" conditions that constitute an ongoing destruction of the constitutional protections of inmates at the federal prison at Fort Dix, New Jersey.

2. Among the other offenses experienced by plaintiff herein are the intentional, malicious, arbitrary and capricious actions engaged in by the administrative staff at the institution, from unit managers and case managers, down through the ranks of the officers with whom plaintiff had daily contact, and many of whom conspired in many circumstances to injure plaintiff in his personal health and well-being, his access to the courts, and the most basic necessities of life.

3. Plaintiff took every opportunity to advise every level of United States, Bureau of Prisons, and FCI Fort Dix officials, from the Department of Justice to the Warden, of the ongoing violations and offenses being committed by staff, and to no avail, as all of those so informed preferred to take no action, or to acknowledge plaintiff's efforts .

4. At the point where plaintiff would have been eligible to be considered for a maximum of 12 months halfway house in accord with the Second Chance Act of 2007, and began soliciting the

3

unit staff for required interview some many months prior to his release date, he was astounded to find that the BOP had failed to create the regulations mandated by Congress to have been submitted years earlier, and was instead being administered with the minimal guidance offered by a successive series of memos from the director, through responsible subordinates.

## JURISDICTION

5. The Court has jurisdiction to hear this matter under 28 U.S.C. 1331 (federal question); 28 U.S.C. § 2201 (creation of remedy); 28 U.S.C. § 2202 (further relief); the holding of the Supreme Court of the United States that a damages action may be brought against federal actors who act under color of their authority when their unconstitutional conduct injures individuals; see: *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.s. 388 (1971); 28 **U.S.C.** § 2674, holding  the United States is liable for tort claims under the Federal Tort Claims Act (FTCA); and civil violations of the Racketeer Influenced Corrupt Organizations Act (RICO).

## Venue

6. Venue is proper, pursuant to 28 USC §1391(b), in the District of New Jersey, in which the prison where the plaintiff was held, FCI Fort Dix, is located.

4

## PARTIES
### *PLAINTIFF, FRANK DIPPOLITO*

7. Frank Dippolito first came to FCI Fort Dix in 1995 as an inmate transfer from another federal institution and was released in 1998. Conditions at the institution were at least 'wanting' at that time, given that the prison consisted of no more than re-purposed military barracks surrounded by a double fence with razor wire. His second stint at the institution began in January, 2010, and the conditions had deteriorated to a point that living conditions, and considerations consistent with minimum standards of the necessities of life, were nowhere evident.

### *The United States of America, the FBOP, Defendants*

8. Defendant United States of America is sued under the Federal Tort Claims Act (FTCA) for the wrongful and tortious acts of its employees and agencies. The United States is implicated through the actions, patterns, policies, practices and customs of the BOP, its policy-makers, agents and officers.

9. Defendant Eric H. Holder, Jr., is or was at all times mentioned herein the Attorney General of the United States and head of the Department of Justice. As such, he shares responsibility for the implementation and enforcement of BOP law and policies, along with then-directors of the BOP, defendants

5

Harley Lappin and Charles E. Samuels, Jr. For purposes of FTCA, Mr. Holder is sued in his official capacity, and under *Bivens* and *RICO*, in his individual capacity.

10. Defendant Harley Lappin is or was at all times mentioned herein Director of the BOP,

11. Defendant Charles E. Samuels, Jr. is or was at all times mentioned herein Director of the BOP,

12. Defendant Joe Norwood is or was at all times mentioned herein BOP Northeast Regional Director,

13. Defendant Kathleen M. Kenney is or was at all times mentioned herein the Assistant Director/General Counsel in the Office of General Counsel. The Office of General Counsel, overseen by Ms. Kenney, provides litigation support for inmate litigation arising out of the prisons located within the region, and provides legal advice to regional office and prison administrators. The Consolidated Legal Centers service a number of institutions in a geographic area. Ms Kenney is sued in her official and individual capacities.

14. Defendant D. Scott Dodrill is or was at all times mentioned herein BOP Assistant Director of Correctional Programs, and is sued in his official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

15. Defendant Ms. J. Conley is or was at all times

6

mentioned herein BOP Assistant Director of Correctional Programs, and is sued in his official capacity under the FTCA, and in her individual capacity under *Bivens* and RICO.

16. Defendant Donna Zickefoose is or was at all times mentioned herein Warden of FCI Fort Dix, and is sued in her official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

17. Defendant Jordan Hollingsworth is or was at all times mentioned herein Warden of FCI Fort Dix, and is sued in his official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

18. Defendant Captain Janel Fitzgerald is or was at all times mentioned herein an administrator at FCI Fort Dix, and is sued in his official capacity under the FTCA, and in her individual capacity under *Bivens* and RICO.

19. Defendant Mr. Hutchens (first name unknown) is or was at all times mentioned herein BOP Regional Safety Director, though that actual title is uncertain, and is sued in his official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

20. Defendant Mr. Holdren (first name unknown) is or was at all times mentioned herein FCI Fort Dix Safety Director, though that actual title is uncertain, and is sued in his

7

official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

21. Defendant Mr. G. Lawhorn (first name unknown) is or was at all times mentioned herein an Associate Warden at FCI Fort Dix, and is sued in his official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

22. Defendant Jacqueline Nichols is or was at all times mentioned herein an Associate Warden at FCI Fort Dix, and is sued in her official capacity under the FTCA, and in her individual capacity under *Bivens* and RICO.

23. Defendant Robert Hazelwood is or was at all times mentioned herein an Associate Warden at FCI Fort Dix, and is sued in his official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

24. Defendant H. Sutherland (first name unknown) is or was at all times mentioned herein an Associate Warden at FCI Fort Dix, and is sued in his official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

25. Defendant Christine Y. Dynan is or was at all times mentioned herein an Associate Warden at FCI Fort Dix, and is sued in her official capacity under the FTCA, and in her individual capacity under *Bivens* and RICO.

26. Defendant Mr. Donahue (first name unknown) is or was at

8

all times mentioned herein, the Unit 6 Case Manager Coordinator at FCI Fort Dix, and is sued in his official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

27. Defendant Mr. Croker (first name unknown) is or was at all times mentioned herein the Food Services Administrator, kitchen 5840, at FCI Fort Dix, and is sued in his official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

28. Defendant Mike Carroll is or was at all times mentioned herein Unit 6 Unit Manager at FCI Fort Dix, and is sued in his official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

29. Defendant Mr. Robinson (first name unknown) is or was at all times mentioned herein Unit 6 Unit Manager at FCI Fort Dix, and is sued in his official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

30. Defendant Mr. K. Bullock (first name unknown) is or was at all times mentioned herein a Unit 6 Case Manager at FCI Fort Dix and is sued in his official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

31. Defendant Ms. Alexander (first name unknown) is or was at all times mentioned herein a Unit 6 Case Manager at FCI Fort Dix, and is sued in her official capacity under the FTCA, and in

his individual capacity under *Bivens* and RICO.

32. Defendant Mr. Harwick (first name unknown) is or was at all times mentioned herein a Cook Supervisor at FCI Fort Dix, and is sued in his official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

33. Defendant Officer Yeoman (first name unknown) is or was at all times mentioned herein FCI Fort Dix 5800 Block Tool Room Officer, and is sued in his official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

34. Defendant Officer Daniels (first name unknown) is or was at all times mentioned herein FCI Fort Dix 5800 Block Compound Officer, and is sued in his official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

35. Defendant Harrell Watts, is or was at all times mentioned herein FBOP Central Office Administrator, and is sued in his official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

36. Defendant Mr. Lemyre (first name unknown) is or was at all times mentioned herein FCI Fort Dix 5800 Block Facilities Director, and is sued in his official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

37. Defendant Officer Smeylk (first name unknown) is or was at all times mentioned herein FCI Fort Dix 5800 Block Facilities

10

Officer, and is sued in his official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

38. Defendant Lieutenant Anderson (first name unknown) is or was at all times mentioned herein an administrator at FCI Fort Dix, and is sued in his official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

39. Defendant John/Jane Doe 1, is or was at all times mentioned herein FBOP Director of Correctional Programs, and is sued in his/her official capacity under the FTCA, and in his individual capacity under *Bivens* and RICO.

40. Defendant John/Jane Doe 2, is or was at all times mentioned herein the Director of The American Correctional Association, and is sued in his/her individual capacity under RICO.

41. Defendant The American Correctional Association is or was at all times mentioned herein a national association in which the FBOP participates, and which accredits prisons throughout the country according to widely accepted standards. The ACA is sued in its private capacity as a corporate person under RICO.

## FACTUAL ALLEGATIONS

### *Conditions at FCI Fort Dix*

42. Plaintiff Dippolito arrived at FCI Fort Dix in January, 2010, on transfer from a privately operated institution, and this marked the second instance that he had served time at the location.

43. Conditions at the institution during Plaintiff's first round of residency were seriously compromised, at a minimum, but had considerably and deleteriously deteriorated by the time of his arrival for a second round.

44. It was well established that several of the buildings, including building 5852, which housed Unit 6, and the plaintiff, had serious asbestos and lead paint issues that had not been remediated, but a memo had been issued by the warden on April 20, 2010, which intended to at least minimize the asbestos propagation. Those memos were totally ignored by Unit 6 unit managers.

45. Other more-or-less anecdotal reports, as for instance from renovation contractors, describe asbestos in the roofing, and as these buildings date back to the 1950s, when asbestos pipe coverings were standard, infiltration through the aging structures can only be assumed. Plaintiff's own father died of

12

mesothelioma 50 years after his initial exposure to asbestos. Plaintiff's request to Health Services Administrator Michelle Baker for cancer or mesothelioma screening was denied, however Warden Hollingsworth's response noted that mesothelioma was not genetic, but caused by asbestos, implying it was not an issue. See Exhibits 'VV', 8 pages.

46. The period of original construction of these buildings also dictates the presumption of lead paint, which in later years has been covered by latex paint, which then blisters, becomes friable, and bursts into the environment, more frequently than not at more microscopic levels. These particles are then moved around by inmate traffic, cleaning efforts, scraped for repainting, and recovered, all without any specific knowledge of the danger by inmates.

47. The water supply at Fort Dix has long been known to have hazardous levels of pollutants due to the many chemical and petroleum spills, as well as numerous large scale landfills, and the disposal of waste generated by electronics recycling engaged in by BOP Unicor prison industries. Prison guards have been advised not to drink the water, yet inmates have no choice, and are subjected to skin absorption of contaminants through showering and other hygienic uses of the water supply. Fort Dix is a known Superfund site.

13

48. The personal address (PA) system in each of the hallways is an addition to the buildings that had not existed on the occasion of plaintiff's first stint at FCI Fort Dix. The high 120 decibel levels incessantly generated from each end of the hallways in the buildings are harmful in several respects. Repeated exposure to noise levels over 85 decibels permanently damages the ears and the cardiovascular system, activates the fight-or-flight response, causing high adrenaline levels and high blood pressure. At one point plaintiff submitted another request (cop-out) to Michelle Baker, Health Services Administrator, asking for a hearing test but never received an answer.

49. Studies show that continual exposure to high noise levels on the job causes two to three times the heart problems of those who work in more serene settings. Studies also show that constant exposure to high noise levels also impedes learning, memory and concentration. Plaintiff complained about these levels and sought the test results confirming them, which he was forced to obtain by FOIA request when institution staff refused to provide them. He later learned from an inmate in the Safety Department at the institution that the readings had been falsified by Defendant Holdren, with the knowledge of Defendant Hutchens. See Plaintiff's Exhibit 'X1', Affidavit of inmate

14

Senior, and subsequent Exhibits 'X2' through 'X11'.

> OPT. HSD/SAf# 1600.09 Occupational Safety,
> Enviromental Compliance, Fire protection, ACA
> standards ensure that housing areas do not have
> excessive noise sources (eg noisey pipes fans, ice
> machienes, or mechanical rooms) close to inmate
> sleeping areas.

50. At the time of this writing, there still exist signs over the exit doors of the gym at FCI Fort Dix, 5800 block, that read, in English and Spanish: *"This door must be unlocked when this building is occupied."* The doors are (always) normally locked when the building is occupied by inmates. There are occasionally over 1000 inmates in this gym building, even though these signs are posted ostensibly for reasons of FIRE SAFETY. All buildings not protected by sprinklers had this same signage at the exit doors: education/ law/leisure library, 5842; medical/chapel, 5801; facilities buildings 5843, 5853; and both kitchen/cafeterias, 5810 and 5840.

51. In 2006, sprinklers were installed at all housing units at FCI Fort Dix, so the doors could now be locked when occupied, and the signs over the doors could now be taken down. However, the signs over the exit doors in buildings 5842, 5843, 5801, 5853, 5840 and 5810 were also taken down, even though those buildings had not had sprinklers installed, and would still be locked when they were occupied by inmates. In addition to the

15

doors being locked, the windows are all secured with heavy iron mesh, which would keep inmates from escaping in the event of a fire. In effect, these buildings would all be death traps were fire to break out.

52. FCI Fort Dix consists of two separate compounds which are delineated as East Compound and West Compound. Publicly available information (i.e., websites, etc.) from the BOP's own sources puts the total population of those two compounds at about 4300 inmates (excluding the separate minimum/camp facility), or about 2150 inmates per compound. The 5800 block compound has two kitchen/dining hall facilities to service meals for the population, but during the 'government sequester', one of those facilities was closed, and the remaining facility had its maximum seating capacity increased arbitrarily from 250 to over 300 in an attempt to accommodate the dining population.

53. For whatever reason this (unofficial, unannounced) policy was implemented, the effect was that 600 inmates at a time were being accommodated by the facility, with all seats occupied, and standing room lines waiting to be served and seated in clear violation of the maximum occupancy, and a certain fire/safety hazard, at a minimum. When inmates had to eat chicken with their hands, they were not allowed to use the hand sink in the hall per Food Service Administrator Defendant

16

Croker. Plaintiff's cop-outs to Defendant Associate Warden Dynan yielded the response that the sink was broken (which it was not, but should have been repaired if it was), and to use the sink in another building. However, once you leave the dining hall you are not allowed to return due to the massive over-crowding. See Exhibits 'WW', 13 pages.

54. On the occasion of a Sunday evening dinner where roast beef was to be served, inmates received a lengthwise filet of carrot in beef gravy, and widespread indignation and complaints soon followed. The kitchen supervisor was thereafter dismissed or transferred without explanation. Yet these kinds of events are demeaning and humiliating to plaintiff and others so situated.

55. Whereas FCI Fort Dix East was an 'open compound', meaning free movement of the inmates, during plaintiff's first stint at the institution, it had become a 'restricted movement' institution by the time he returned for a second round. Moreover, a third perimeter fence had been constructed outside the typical second fence, low security perimeter, and razor wire interior fencing had been added, making an unheard of four fence perimeter, all supposedly at the behest of the warden. Rumors of financial collusion and high-level investigations ran rampant through the inmate population as a result.

17

56. The housing units, being re-purposed barracks buildings, consist of mostly multiple occupancy rooms, usually having four double-hung windows (upper and lower sash). The larger rooms were formally 10-man rooms, consisting of 4 double bunks, and 2 single beds at the windows. Since plaintiff's arrival for his second round at FCI Fort Dix, two of the four windows had been closed up, and the 2 single bunks had become doubles. To reconcile the decreased ventilation, two ceiling fans had been installed in each room.

57. Whereas inmates had previously been allowed to have personal fans, these were no longer permitted, as receptacles in the rooms had either been eliminated or inactivated. During sweltering outside weather conditions, even with the remaining two windows open, and the ceiling fans operating at full speed, the environment was oppressive, especially in the morning when the humid, stale air made body stench and dirty laundry, mixed with McGuire air force base jet exhaust fumes, nauseating. This is a breeding ground for all manner of disease organisms.

58. The only circulation in the buildings is usually one fan at either end of the hallways, Which only affects the hallways, and inmates are better served to sleep sitting up in their plastic chairs, usually in the hallways, rather than in beds in their rooms.

18

59. The gymnasium had been fitted with air conditioning for the guards, probably around the same time the warden was contracting to have excessive fencing installed inside and outside the perimeter fencing, at a cost of at least hundreds of thousands of dollars, for whatever reason, and for the benefit of whomever stood to receive the monetary rewards for such an expenditure. Meanwhile, inmates are made to suffer cruel and unusual punishment above and beyond what society dictates via the laws promulgated through the democratic process.

60. Whatever standards of cubic feet of fresh air may be dictated by civil engineering authorities in environments where human beings are forced into confinement, they are seriously lacking when ventilation systems are turned off in fall, winter and spring to conserve resources while inmates are sickened, and staff are lavished with the same excesses as private contractors who consume monies which cannot be justified under standards of security promulgated by the Bureau of Prisons. The BOP claims it provides 10 cubic feet per minute per inmate of fresh or filtered air, and 15 cubic feet in renovated buildings. That is an absolute misrepresentation that cannot stand the test of the stench or the respiratory illnesses, reported or not. See BOP Policy Statements: P.S. 1600.09, P.S. 4200.10, P.S. 6360.01.

61. Another contributor to the respiratory distress of

19

inmates is the jet fuel exhaust emanating from the runways of McGuire Air Force Base. In 2011 Congress held hearings to examine the effect of jet fuel pollution and jet engine exhaust as they impact communities. FCI Fort Dix is at the base of the McGuire runway, and the jet exhaust frequently lingers for days at a time, depending on wind and other weather factors.

62. Whatever standards of inmate care may be promulgated by the BOP, if they are applied to inmates' seasonal dress, they fall far short of any reasonable standard of consideration. In plaintiff's case -- and this should be typical of FCI Fort Dix clothing issued, as demonstrated in plaintiff's Exhibit 'H', and the many pages therein exemplifying the lengths to which he went to obtain either appropriate seasonal clothing (rain, cold, etc.,), and the equal lengths to which the administration went to make him responsible for those things that should have been provided by the institution -- i.e., rain gear, winter coat, etc., Instead, they attempt to make him responsible for either purchasing these items out of his own pocket, or filing inane requests that receive inane responses from administrative staff who are not intelligent enough to form meaningfully justifiable responses to meaningful requests.

63. The callous indifference to inmate health and safety is typified by a remark made by Warden Zickefoose to plaintiff on

20

January 11, 2011, an occasion when she was on the grounds, and in response to plaintiff's question about inclement and cold weather, asked plaintiff if he had a hat, and then suggested he get the proper clothing. Proper clothing is not issued at FCI Fort Dix. Other responses from staff included suggestions that he look for other work, and that he buy a poncho for $3.50. See Plaintiff's Exhibit 'H',, 8 pages.

64. On an occasion when plaintiff and other yard crew were directed by their supervisor to return to their units due to 24 degree temperature and a wind chill of 18 degrees, plaintiff was formally disciplined, this as a separate act of retaliation, which nevertheless demonstrates not only administrative indifference to the conditions, but the deliberate intent to use it for overtly malicious purposes. After this incident, in December of 2010, when other yard crew inmates were dismissed to their units for severe weather, plaintiff had no choice but to remain in the elements, even occasionally seeking shelter in the porta-pot.

65. The BOP promotes a culture of violence and competition, first by the mere fact of crowding 370 people into one building, but then adding to that the aggravating factor of making them compete for the limited resources available, especially in the basic necessities. On the hottest days of the year, and given

21

the poor ventilation in the buildings, inmates need ice to try to keep themselves at some comfort level, yet the one ice machine in a building may accommodate 75 people, and another 300 will simply do without.

66. Other resources such as phones, microwaves, e-mail terminals, and even tables, cause competitive attitudes among inmates. Thee are eight phones in a building. In the daytime only two are on. There are two microwaves per unit building, and only one table with two seats in each twelve man room.

67. Violence is frequently the result of the competition for these resources, and the BOP seems to desire it where violent offenders are not segregated from non-violent, not the young from the old, nor the more aggressive from the more timid, as in the case of sex offenders, who are especially targeted for violence, a fact about which the BOP is acutely aware, yet chooses to ignore.

68. Many of these same issues will come into play when the Unit Staff attempt to retaliate against plaintiff for having the audacity to request consideration under provisions of the Second Chance Act for extended halfway house, as they engage every pretense of policy violations by plaintiff while ignoring their own policy responsibilities for plaintiff's health and well-being.

22

69. In the course of attempting to obtain the minimal level of fair treatment and reasonable consideration for the basic necessities of life, plaintiff solicited the unit staff's assistance, first from his Case Manager, Kevin Bullock, from Unit Manager Carroll, from Warden Zickefoose, and from his direct supervisors. In addition, Case Manager Coordinator Donahue, and Wardens Zickefosse and Hollingsworth were copied on many of the requests, respective of their separate tenure. At one point Zickefoose had a unit counselor communicate to plaintiff that she wanted no more paper work from him.

70. Everyone at the highest levels of the federal government and the institution, from the from the Department of Justice and Bureau of prisons, to the wardens, associate wardens, captains and lieutenants, to the guards and department heads, medical staff and inmates have known about the unsafe and unhealthy conditions at FCI Fort Dix from its inception. Many could have blown the whistle, as did two medical doctors who had no choice in the best interest of their patients but to let it be known that over one thousand pending blood tests were not processed over many months for chronically ill inmates who needed periodic monitoring and follow-ups to avoid life-threatening complications.

71. A 17 page report by the Department of Justice on an

23

investigation into that situation, OSC Case Nos. DI-11-2109, DI-11-2110, laid the blame squarely at the feet of the BOP for failing to hire sufficient technical staff to perform the required lab work. Again, this is typical of the BOP attitude towards the health and safety of inmates under their care, and another indication of their total disregard for Eighth Amendment protections of those inmates, en masse.

72. Staff follow the unstated policy of willful blindness, and whistle blowers are practically unknown. No staff drink the water, and they don't spend 24 hours a day, 7 days a week, 52 weeks of the year at the institution. They go back to their homes, and the institution and its shoddy practices are non-existent. The organization known as Federal Correctional Institution Fort Dix is as corrupt as any Mafia racket could ever exemplify, from Washington, D.C., BOP administration to the halls and grounds of the Fort Dix military base it occupies.

## CLAIMS FOR RELIEF
### FIRST CLAIM FOR RELIEF
**EIGHTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES, CRUEL AND UNUSUAL PUNISHMENT**
*(Bivens v Six Unknown Named Agents of Federal Bureau of Narcotics)*
**(Against Defendants Holder, Lappin, Samuels, Zickefosse, Hollingsworth, Lawhorn, Dynan, Nichols, Hazelwood, Sutherland, Norwood, Unit 6 Carroll, Robinson, Bullock, Alexander, Donahue, Fitzgerald, Kenny, John/Jane Doe 1,Dodrill, Conley, Hutchens, Holdren, McGloughlin, Harwick, Yeoman, Daniels, Watts, Lemyre, Croker, Smeylk, Anderson)**

24

73. Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 72.

74. By their enforcement of illegal standards and conditions at FCI Fort Dix that violate any reasonably objective expectation of Eighth Amendment protections, Defendants Holder, Lappin, Samuels, Zickefosse, Hollingsworth, Lawhorn, Dynan, Nichols, Hazelwood, Sutherland, Norwood, Unit 6 Carroll, Robinson, Bullock, Alexander, Donahue, Fitzgerald, Kenny, John/Jane Doe 1,Dodrill, Conley, Hutchens, Holdren, McGloughlin, Harwick, Yeoman, Daniels, Watts, Lemyre, Croker, Smeylk, Anderson while purporting to act in the performance of official duties under color of federal law, have damaged plaintiff Dippolito in those Constitutionally protected rights.

75. The Federal prison at FCI Fort Dix is in violation of the Constitution of the United States because it is overcrowded, lacks adequate sanitation and ventilation, exposes prisoners to asbestos, polluted water and lead paint, violates numerous policy statements and noise levels, and offers inadequate medical treatment; Additionally, FCI,Fort Dix subjects prisoners to high levels of jet fuel exhaust.

76. These defendants actions, omissions, policies, patterns, practices and customs as complained of herein were

25

intentional and reckless and demonstrate a callous disregard for, or deliberate indifference to, Plaintiff Dippolito's health, safety and welfare while an inmate at FCI Fort Dix over a four year period.

77.   These violations constitute cruel and unusual punishment that are not intended under the laws of the United States and are compensable under *Bivens v Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 US 388 (1971). As a direct result of these defendants, plaintiff has suffered physically and emotionally, and may not fully manifest the most serious damages until later years when considering the stealthy killer asbestos, and other known and unknown contaminants that are the legacy of Fort Dix.

**WHEREFORE**, Plaintiff demands judgment in the amount of one million dollars compensatory damages; and,

Joint and several liability from the Defendants herein; and

Attorney's fees and costs of suit; and,

Punitive damages to be determined by a jury.

### SECOND CLAIM FOR RELIEF
*EIGHTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES,
CRUEL AND UNUSUAL PUNISHMENT*
*(Federal Tort Claims Act, 28 USC §1356(b))*
(Against Defendants United States of America, Bureau of Prisons,
Holder, Lappin, Samuels, Zickefosse, Hollingsworth, Lawhorn,
Dynan, Nichols, Hazelwood, Sutherland, Norwood, Unit 6 Carroll,
Robinson, Bullock, Alexander, Donahue, Fitzgerald, Kenny,
John/Jane Doe 1,Dodrill, Conley, Hutchens, Holdren, McGloughlin,

26

**Harwick, Yeoman, Daniels, Watts, Lemyre, Croker, Smeylk, Anderson)**

78. Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 72.

79. The acts and events set forth above constitute negligent and wrongful acts and omissions of agents and employees of the United States government, that is, allowing cruel and unusual punishment that is not intended under the laws of the United States about which defendants cannot claim ignorance based on assumptions of oaths and responsibilities of those acting in official capacities under color of federal law, Defendants United States of America, BOP, Holder, Lappin, Samuels, Zickefosse, Hollingsworth, Lawhorn, Dynan, Nichols, Hazelwood, Sutherland, Norwood, Unit 6 Carroll, Robinson, Bullock, Alexander, Donahue, Fitzgerald, Kenny, John/Jane Doe 1, Dodrill, Conley, Hutchens, Holdren, McGloughlin, Harwick, Yeoman, Daniels, Watts, Lemyre, Croker, Smeylk, and Anderson, while purporting to act in the performance of official duties under color of federal law, have damaged plaintiff Dippolito in the Constitutionally protected right to be punished without resort to cruelty and other unusual means.

80. Defendants have violated Plaintiff Dippolito's Eighth

27

Amendment protections under the Constitution of the United States, in the name of the government and its agencies, and have damaged plaintiff in those rights, to wit, endangering his health and safety, causing severe emotional and physical distress, and uncertainty about his future well-being as a result, and have either denied relief for, or failed to respond to, the many tort claims filed by plaintiff while he was incarcerated at FCI Fort Dix.

81. Plaintiff is entitled to damages to his rights inflicted by those acting within the scope of their offices and employment under circumstances where the Defendant United States Government, if a private person, would be liable to the plaintiff under the Laws of the State of New Jersey.

**WHEREFORE**, Plaintiff demands judgment in the amount of one million dollars ($1,000,000.00) per year over the four years he endured the hardships of said violations;

Plus costs of suit; and,

Reasonable attorney's fees.

### THIRD CLAIM FOR RELIEF
**FIRST, FIFTH AND EIGHTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES,**
**RIGHT TO PETITION FOR REDRESS OF GRIEVNCES, DUE PROCESS, AND CRUEL AND UNUSUAL PUNISHMENT**
*(Bivens v Six Unknown Named Agents of Federal Bureau of Narcotics)*
**(Against Defendants Bullock, Carroll, Daniels, Alexander, Harwick, and Anderson)**

82 Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 73, although some are repeated here in specific separate context.

83. As conditions at the institution were brought to the attention of all levels of the administration by plaintiff, and he began formally requesting consideration for extended halfway house under the Second Chance Act, the unit staff began to assert obvious retaliation and harassment against him. The issue of insufficient and substandard seasonal clothing became the issue targeted specifically by Defendant Kevin Bullock.

84. On October 19, 2010, after plaintiff's repeated requests, both verbally and with successive higher level cop-outs, Case Manager Bullock made his first overt move against plaintiff by going to his room and searching his locker and trash can, finding an official memo from D. Scott Dodrill, Asst. Dir. of Corr. Programs, and assuming the latter to be a 'secret memo', proceeded to the law library, with Counselor Sanchez in

29

tow, and took Inmate Garcia into custody.

85. When plaintiff returned to the unit some time later, he was informed that Inmate Garcia was in Bullock's office, and so plaintiff went to the unit offices, and found Bullock screaming at Garcia. When plaintiff appeared in the doorway, Bullock immediately turned his wrath upon plaintiff, screaming and flailing his arms, and accusing plaintiff of being in possession of the 'secret memo', and of helping Inmate Calvanese write his own cop-out for Second Chance Act halfway house consideration.

86. Plaintiff informed Bullock what Garcia had already told him, that the memo came from the internet, and that it was a publicly available document, which Bullock then had to discover on his own was actually true. Yet he was not to be deterred in his intent to have his way with plaintiff, and later Garcia.

87. On October 28, 2010, Bullock appeared on the compound where plaintiff was working with the crew, and instructed them they were to work until 2:00 P.M., having no knowledge of their actual schedule, and not having Officer Hawtin, the crew supervisor, there to correct him. He left only to return a little while later waving the compound roster in the air, and informing the yard crew they were to remain on the compound until 10:30 A.M., actual quitting time.

88. Plaintiff then sought out Officer Hawtin for direction

30

at 9:40 A.M., and was told by him that the crew could return to their units. This was in fact the usual and customary course of action when work was completed or weather conditions were severe.

89. Plaintiff was summoned at around 11:00 A.M. to Case Manager Bullock's office, where he was informed by Bullock that he was taking plaintiff's job, accusing plaintiff of doing legal work while he should be doing his job, and implying that he had talked to Officer Hawtin, who was in concurrence, none of which was true. Counselor Holterman was present, and said that plaintiff should not be terminated, and that if he wasn't doing his job, he should be given an incident report (a shot). Since the whole thing was a fabrication, Bullock knew Hawtin would not write a shot, and Bullock had no authority to do so. He was visibly unhappy about all of that, but still not be deterred.

90. When Bullock threatened to take plaintiff's job and have him reassigned, plaintiff asked Holterman if he would go along with this dirty business, which threw Bullock into a rage, and he accused plaintiff of calling him dirty in the presence of other inmates out in the hall. When plaintiff stepped out of the office, Bullock pursued him, shouting that plaintiff had called him dirty in front of the inmates, and plaintiff when back to his quarters.

31

91. On October 29, 2010, Bullock saw plaintiff waiting for Counselor Sanchez, and approached him, saying he knew plaintiff worked hard and did a good job, would not transfer him, and making light of his previous actions. Plaintiff was acutely aware that Officer Hawtin had stood up to Bullock, and that he would have come to plaintiff's aid had it been necessary.

92. On 12/21/10 plaintiff reported to his job assignment, 8:00 A.M., to AM compound-labor pool. December 21st was a very cold day, wind blowing 50 mile an hour gusts. No role call was taken when plaintiff reported, no job assignments were given out, Officer Daniels dismissed everyone and returned to the Office. Most of the crew members returned to their respective units. At 10 am plaintiff returned to his unit.

93. The building is a secure unit, no one can enter without the unit officer unlocking the door. The unit officer that day was Cook Supervisor Harwick. Plaintiff asked Harwick for permission to enter and it was granted. Plaintiff was standing in the stair well, jacket in hand when Case Manager Bullock came into the building. Case Manager Bullock asked plaintiff, "what are you doing in the building? You work AM yard." plaintiff responded: "when it is this cold they don't expect us to stand on the compound, especially with only a light weight jacket. Plaintiff was repeating what officer Winn stated on 12/19/10 the

32

first day of the quarter rotation of AM yard officer. He had stated "I don't expect the crew to stand out in the cold".

94. Case Manager Bullock said "are you sure?" He then looked at his watch and went up the stairs to his office. Later that day plaintiff was called to Lieutenant Anderson's office. Upon entering the office Lt. Anderson began screaming at plaintiff, stating that plaintiff will be punished for lying and being in an unauthorized area. Plaintiff told Lt. Anderson that he had not lied and that Officer Harwick gave him permission to enter, and he could not have entered because it is a secure unit. How would plaintiff get into the building? See Exhibit CD)

95. Lieutenant Anderson picked up the phone. Plaintiff can only guess that he was calling cook Supervisor Harwick, the unit officer of 5852. When he hung up the phone, he then continued screaming. He screamed that plaintiff is guilty, handed him the Incident Report and dismissed him. See Exhibit (E), Incident Report of 12/21/10

96. Plaintiff returned to building 5852, he went directly to officer Harwick. Harwick said he didn't want to get involved. Plaintiff asked if he told Case Manager Bullock that plaintiff had entered with his permission. Officer Harwick would not answer. Later that day Inmate Garcia, who works in the kitchen with Officer/Cook Supervisor Harwick, stated that Harwick said

33

he was just trying to earn some overtime and didn't want to get involved. See Exhibit (F) Affidavit from Inmate Garcia.

97. The next day, 12/22/10, Case Manager Bullock had his unit team conduct a hearing. Plaintiff objected stating that Case Manager Bullock's unit six unit team would not be impartial, especially with Unit Manager Mike Carroll Calling the shots. Plaintiff's objection was ignored. Also plaintiff requested for Harwick to testify along with the witness from the AM yard Crew. The request for Harwick's testimony was ignored. The request for AM Yard Workers was Denied.

98. This is a violation of plaintiff's due process rights. They held a Kangaroo Court. Unit Manager Mike Carroll was in the back room. On two occasions the hearing was delayed, Counselor Holterman and Case Manager Alexander had to confer with Unit Manager Mike Carroll. The plaintiff was found guilty because Lieutenant Anderson lied. He stated that plaintiff confessed. Plaintiff never confessed to Case Manager Bullock's FALSE allegations. Counselor Holterman told plaintiff the sanctions would be 90 days loss of e-mail, visits and commissary.

99. The next day, 12/23/10, Holterman told plaintiff that the sanctions were 90 days loss of e-mail, visits and Telephone. Plaintiff believes that Counselor Holterman changed loss of commissary to loss of phone because he was redirected by Unit

34

Manager Mike Carroll. Plaintiff was now cut off at Christmas from all forms of communication to his family and adolescent daughter. See Exhibit (G), BP-9-10-11, appeal requests to remove the incident report.

100. On December 23, Officer Daniels told plaintiff he had signed a statement for Case Manager Bullock, stating he (Daniels) did not give plaintiff permission to return to his unit. On January 5, 2011, Officer Daniels was in his office. The entire AM Yard Crew had returned to their respective units. Plaintiff went to Officer Daniels office and asked for a job assignment. Daniels was angry, he stated you know there are no job assignments, don't ever ask me for a job assignment. Get out there and stand on the compound, it is a big compound. Plaintiff then replied then give me permission to return to my unit as the entire crew has done. Daniels pointed to the door.

101. When plaintiff reached the compound Daniels was on the PA summoning the AM Yard Crew to his office. Daniels gathered everyone around him. He told them that there was a rat. The rat had told him that the crew went back to their units. The entire Crew looked at plaintiff. They all knew that plaintiff was the only one out on the compound and he was a target of Case Manager Bullock.

102. Daniels stated he was telling the crew this because he

35

was a good guy and wanted everyone to know there was a threat of a rat. He dismissed them, they returned to their units unmolested and without formal permission. Neither Daniels nor any compound officer would ever tell the crew they could return to their units after plaintiff's incident report from Case Manager Bullock, even if it was raining, snowing, freezing or windy. this was done to make it impossible for plaintiff to find shelter.

103. The crew always returned to their units during inclement weather, without formal permission. Plaintiff was stuck. He could not get formal permission and Case Manager Bullock was waiting in the unit for plaintiff to return. He knew that Daniels would not give him permission. FCI Fort Dix doesn't issue coats or rain gear. A wind breaker and a light weight jacket is the issue. Plaintiff filed many requests to staff requesting proper clothing. See Exhibits (H).

104. The plaintiff's health and well being were compromised. Plaintiff suffered from extreme cold and wind, and had nowhere to find shelter. Plaintiff had to stay moving to keep from freezing. Plaintiff was also put in grave danger by Officer Daniels, since Officer Daniels told the entire yard crew that the plaintiff was a rat.

105. As plaintiff has already stated, competition and

36

violence are encouraged, and Officer Daniels' statement to the yard crew was an invitation for them to take whatever steps they may wish in dealing with a rat. Officer Daniels knew this as well as any correctional officer should, and his intent was as clear as it was reckless, irresponsible and malicious. See Exhibit(I) tort claim: "plaintiff's life was in danger." of 1/28/11. See exhibit(J) Letter to the OIG, 1/13,/11, 2nd page, 4th paragraph.

106. On 12/21/10 Officer Daniels signed a statement saying he did not give plaintiff permission to return to his unit, even though he allowed the entire crew to return because of the cold. He did this to further Case Manager Bullock's retaliation. This enabled Case Manager Bullock to believe he could issue plaintiff an incident report, but Daniels was plaintiff's direct supervisor, and as such, was the only person qualified and responsible to issue the incident report. He didn't issue the incident report, Case Manager Bullock did.

107. Plaintiff was further retaliated against on March 15, 2011, when his application for a bottom bunk was denied. Plaintiff was senior in line for the next available bottom bunk. According to unit six unit team, the incident report of 12/21/10 precluded plaintiff from a bottom bunk. The Fort Dix A and 0 hand book does not contain a rule or provision to keep an

37

inmate from a bottom bunk based on the adjudication of an incident report. The only criterion unit six unit team considers when deciding bottom bunk assignments is seniority. Therefore, to consider any other criteria or factors when assigning a bottom bunk is the imposition of personal animosities and thus, retaliation. See Exhibit (K), BP-8, 9, 10, 11, requests for bottom bunk.

108. In this Particular instance, unit six unit team, specifically, Case Manager Bullock and Unit Manager Carroll, denied plaintiff a bottom bunk on the basis of being adjudicated on the incident report of 12/21/10. Unit six unit team is considering factors that according to it's own A and O hand book, is impermissible.

109. Plaintiff then availed himself of the Administrative Remedy Process to document unit six unit team's retaliation, and asked to correct the decision of denying him a bottom bunk. Case Manager Bullock respond by summoning Officer Yeoman to the plaintiff's housing unit, and ultimately plaintiff's room to issue him another incident report. Officer Yeoman is the 5800 Block tool room supervisor and has no business in the housing unit, unless it is to act as Bullock's personal hatchet man.

110. According to the incident report, officer Yeoman discovered gambling paraphernalia on the table in plaintiff's

38

room. Yeoman issued plaintiff the incident report even though there are 12 inmates in the room and the gambling paraphernalia, a note book, contained the name of another inmate in the room. That inmate admitted to the note book ownership and signed an affidavit to that effect. Case Manager Bullock refused to set aside the incident report, insisting there was going to be a hearing by his unit six unit team. See Exhibit(L), Affidavit from John Macali, owner of the notebook. Also See Exhibit (M), affidavit from Larry Robinson.

111. Plaintiff immediately documented that Officer Yeoman had no business in his housing unit and made inmate Macali's affidavit a part of the record. Case Manager Bullock summons plaintiff to his office on 9/28/11 and sheepishly rescinded Officer Yeoman's incident report. Note that Yeoman doesn't rescind it; Case Manager Bullock does. See Exhibit (N), incident report 9/23/11. Also Exhibit(Q),letter 9/24/11,OIG.

112. This is not Case Manager Bullock's first foray in the art of retaliation. Case Manager Bullock also denied Inmate Michael Garcia, prison #40236-424, a bottom bunk on the basis of adjudication of an incident report. Unit six unit team, specifically Case Manager Bullock's other foray was against Herbert Council, an inmate that was at FCI, Fort Dix and on Case Manager Bullock's case load. In 2006, Inmate Council filed a

39

habeas corpus against Case Manager Bullock's retaliation.

113. The Judge dismissed the government's motion for summary judgment on the basis that Case Manager Bullock *did* retaliate. Case Manager Bullock was eventually dismissed from the suit. However, Case Manager Bullock's fingerprints are all over the retaliation claims of Plaintiff Dippolito and Inmate Garcia. The irrefutable proof Unit six unit team, specifically, Case Manager Bullock and Unit Manager Carroll, retaliated against plaintiff for filing grievances and attempting to access the courts can be found in the sanctions of the incident report adjudication. See Exhibit (p) incident report and adjudication.

114. Plaintiff was sanctioned with revocation of his visiting, phone and e-mail for 90 days. Not only was this retaliation,it was mean spirited as was Unit Manager Carroll and Case Manager Bullock's attempt to isolate plaintiff from his family. However, Inmate Goday's adjudication on a more serious incident report, was only sanctioned with the restriction of his phone for 30 days. See Exhibit (Q), Inmate Goday's Incident report and adjudication.

115. Inmate Garcia is familiar to plaintiff. Although Case Manager Bullock was not successful in his attempt to remove plaintiff from his work assignment, Case Manager Bullock was successful in removing Inmate Garcia from his work assignment at

40

the library, where he also assisted inmates in the preparation of legal papers. It is curious, and odd, to be terminated by a unit manager and not the job supervisor. Unit Manager Carroll terminated Inmate Garcia under the guise of poor work performance even though his most recent work performance sheet indicated he was satisfactorily performing his job. Inmate Garcia, a day after his termination from education was assigned to the carpentry shop. Not coincidentally, on the his 2nd day he was issued an incident report. Inmate Garcia was terminated from education to keep him away from the library and obstruct his access to the courts.

116. Plaintiff availed himself of those to whom he had access -- prison officials, for assistance. Specifically, Case Manager Bullock, and his unit team. See Exhibits (S)1 through (S)-5, from plaintiff's habeas corpus action. The unit team responded by misdirecting, spinning and obstructing plaintiff and ultimately retaliating against him. See Exhibits (C) and (D), letters to Inspector General, and Exhibit (T), Letter to Eric Holder. These letters detail Case Manager Bullock and Unit Manager Carroll's retaliation beginning with the verbal assault on plaintiff on October 19, 2010. The attempt to remove plaintiff from his job assignment and then the frivolous incident report on December 21, 2010.

117. Letter to the OIG dated 12/28/10 part of exhibit (C) illustrates Case Manager Bullock's attempt to remove plaintiff from his work assignment. Case Manager Bullock was rebuked by Compound Officer Hawtin, plaintiff's immediate supervisor. Correctional Counselor Holterman is also on record as opposing Case Manager Bullock's attempt to remove plaintiff from his work assignment. Case Manager Bullock and Unit Manager Carroll's retaliation against plaintiff culminated in the incident report on December 21, 2010. plaintiff contends that incident report is frivolous. Had the numerous requests to staff been answered it would have proven the incident report was retaliation and thus, frivolous. plaintiff also contends that the ARP does not offer relief. The Administrative Remedy Process,(ARP), therefore is futile.

118. Plaintiff was not sancitioned with the loss of commissary, but with the revocation of phone, visits and e-mail for 90 days. Commissary privilages were not revoked because plaintiff did not utilize commissary. Instead, he was cut off from family. Inmate Garcia, who is 800 miles from home, was also cut off from family, this seeming to be the preferred sanction of a unit team, especially Bullock and Carroll, who are totally lacking in any semblance of empathy, and are intent on punishing inmates in the cruelest and most unusual ways for exercising

42

constitutionally protected rights. Moreover, the concept of due process seems to imply that even in the administrative setting, petitioners should have the right to call witnesses in their behalf, and not have the guard staff called into play as pawns to the bidding of the unit team, or any of them.

119. Plaintiff documented each and every action taken against him, and took care to copy as many people on his written responses as possible. In addition, plaintiff sought help from the warden and associate wardens, as well as BOP administraors outside the institution, and even to the Office of the Inspector General, all to no avail. The record is clear that these actors were free to do as they wished, with no recriminations, and that it was sanctioned at the highest levels of the institution and the BOP and DOJ in Washington, D.C.

120. Case Manager Bullock knew that plaintiff and Inmate Garcia assisted other inmates in the legal paperwork, and that they also worked together on legal issues, most importantly for plaintiff, his Second Chance Act requests, Hence, when Bullock found the so-called 'secret memo' in plaintiff's locker, he immediately went to the library, where he knew he would find Garcia, and apprehended him for interrogation. Terminating Garcia's job had a duel purpose for Bullock: first, that he was impeding Garcia's ability to do legal work, and therefore his

43

personal access to the courts; and, second, impeding his ability to work with other inmates, including plaintiff, and their access to the courts.

121. Bullock also knew that plaintiff had filed a habeas corpus in the matter of his denial of any relief at all under the Second Chance Act, which he admitted in responding to a cop-out when he recognized that plaintiff had been denied relief as moot in the habeas action. But plaintiff appealed that denial, and unbeknownst to plaintiff, the US Postal Service had returned his appeal for insufficient postage.

122. Bullock held that returned piece of mail for around a month, and when he finally gave it to plaintiff, the stamps had been scribbled in ink, and it was too late to make the deadline for filing the appeal. Nevertheless, plaintiff repackaged and resent the appeal, only to receive a note from the court in dismissing the appeal, dated a month earlier. When plaintiff sent his repacked appeal, he included a motion to file out of time, and it was refused by the court, saying that plaintiff was responsible for having the correct postage to begin with. Plaintiff still has the envelope with insufficient postage and scribbling.

123. Still, Bullock wasn't satisfied. When plaintiff made his first filing of this herein complaint with the district

44

court, The court issued an Order on 10/11/2013 allowing plaintiff to file an amended complaint. That order was returned to the court as undeliverable on 10/30/2013, because Bullock, or someone on the unit team, failed to give it to plaintiff. The unit team is responsible for handing out legal mail. The event was only discovered by plaintiff when he sent someone to the court clerk to obtain a docket sheet to ascertain the status of his case.

124. Added to the circumstances described earlier with respect to the 'kangaroo court' style hearing conducted by the unit team, at Bullock's urging, and the refusal of any right to have witnesses, especially where a staff member signed a complaint, and the imposition of punishment thereafter far in excess of what would normally be meted out, it is apparent that the unit team, and especially Bullock, have no regard for the constitutional protections inherent in the right to petition the court/government per the First Amendment, the right to due process per the Fifth Amendment, or the right to be spared cruel and unusual punishment per the Eighth Amendment.

125. At all times mentioned herein, Defendants Bullock, Carroll, Daniels, Alexander, Harwick, and Anderson, while purporting to act in the performance of official duties under color of federal law, have damaged Plaintiff Dippolito in those

45

Constitutionally protected rights.

**WHEREFORE**, Plaintiff demands judgment in the amount of one million dollars compensatory damages; and,

Joint and several liability from the Defendants herein; and

Attorney's fees and costs of suit; and,

Punitive damages to be determined by a jury.

### FOURTH CLAIM FOR RELEIF
*(RACKETEERING INFLUENCED CORRUPT ORGANIZATIONS ACT)*
*(Against Defendants  Holder, Lappin, Samuels, Zickefosse, Hollingsworth, Lawhorn, Dynan, Nichols, Hazelwood, Sutherland, Norwood, Unit 6 Carroll, Robinson, Bullock, Alexander, Donahue, Fitzgerald, Kenny, John/Jane Doe 1,Dodrill, Conley, Hutchens, Holdren, McGloughlin, Harwick, Yeoman, Daniels, Watts, Lemyre, Croker, Smeylk, Anderson, Gondles, and American Correctional Association)*

126. Plaintiff re-alleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 72, and 83 through 125.

127. The conditions and seemingly official actions, omissions, policies, patterns, practices and customs as complained of herein are not government, *per se*, but an organized, concerted effort to obtain ends not contemplated by law, but in furtherance of objectives, whether outwardly expressed among all of the individuals as such or not, are more in the nature of personal gain and security. In those terms, it

46

may be said that the institution trades in a commodity it identifies as 'inmates', and uses that commodity to reap profits and rewards.

128. Inmates cross not only interstate borders, but international ones as well, as do most of the goods and services the institutions consume.

129. Defendant American Correctional Association (ACA), by and through its officers/employees, Defendant Gondles, lends legitimacy to the institution FCI Fort Dix through this concept:

**Defense against lawsuits.**
Accredited agencies have a stronger defense against
litigation through documentation and the demonstration
of a "good faith" effort to improve conditions of
confinement. ACA website,
https://www.aca.org/standards/benefits.asp

130. Another hurdle in the information availability is that the ACA accreditation cab only be obtained from the BOP by a Freedom of Information Act Request (FOIA), and plaintiff has only recently discovered that obstacle, but it makes the case for more of the deliberate impediments to having justice.

131. One of the necessary objectives of that 'enterprise' is to keep as much of the commodity (inmates) on hand as to keep the profitability margin as high as possible. One means to accomplish that is by denying inmates more halfway house time as required by the Second Chance Act. Defendant Holder, in his

47

official capacity as Attorney General, and Defendants Lappin and Samuels, in their official capacity as Directors of the BOP, were expected to write regulations to implement the Act's provisions within 90 days of its passage in 2008, yet six years later that has not been done, and the BOP administers the Act illegally through memos.

132. Meanwhile, most of the funds provided by Congress for the Second Chance Act, to benefit federal inmates with more halfway house time, are funneled to government agencies instead, as evidenced in *Bureau of Justice Assistance Grants for Fiscal Year 2011.*

133. This is the same Eric Holder who lied to Congress about his knowledge of the 'Fast and Furious' gun running scandal, and who has refused to prosecute the 'too big to fail (and prosecute)' banks that have been stealing billions and trillions of dollars from the public. The same Eric Holder who blocked subpoena enforcement of the new York state prosecutor who was attempting to tie one of those banks to the Bernie Madoff Ponzi scheme.

134. This is also the same Eric Holder who was informed by plaintiff of the things going on at FCI Fort Dix, along with most of the other defendants, all of whom turned a blind eye. And meanwhile, the henchman in this enterprise, members of the

Unit 6 Unit Team, attempted to intimidate plaintiff to stop his informing to the highest levels of government administration, and punished him for not doing so.

135. The accreditation that came from ACA lends credibility to the institution, even though the standards and conditions at Fort Dix are totally out of line with accepted norms, and far below what plaintiff and other inmates witnessed at the more respectable institutions in the system.

136. Commissary items cost far in excess of what they would in most shops in the country, and inmates believe that the profits are somehow used to fund the commissary and that the rest are used for their benefit. However, since the Department of Justice had a report issued in 1995 deciding that the Commissary Trust Fund could be handled without the Common Law fiduciary oversight normally afforded such trusts, it was free to do with it however administrators wished. The FCI Fort Dix commissary serves over 4300 inmates and does tens of thousands of dollars in business a week, and is staffed mostly by inmates. That leaves a lot of room for skimming.

137. As already stated, when Defendant Zickefoose had a third and fourth perimeter fence contracted to outside vendors, rumors flew that she was in the spotlight, and that some under-the-table consideration had passed to her. The fences were a BOP

49

anomaly, for sure, but insider advantage was no surprise to inmates who always expect the worse at FCI Fort Dix. Where these fences had to have cost in the hundreds of thousands of dollars to erect, ventilation, asbestos abatement, sufficient cold weather clothing, and all the other things complained of herein are still wanting, and there is no reasonable explanation to justify such lop-sided expenditures.

138. Access to the courts is always impeded as a matter of course at FCI Fort Dix simply because it is not considered a priority in comparison to other activities, as for instance, the gymnasium. The law library is open Monday through Sunday from 7:30 A.M. to 10:30 A.M. and 12:30 P.M. to 3:30 P.M.; Monday through Thursday 5:30 P.M. to 8:00 P.M., 52 hours per week. The gym is open seven days a week, 6:00 A.M. to 10:30 A.M., 11:00 A.M. to 3:30 P.M. and 5:30 P.M. to 8:00 P.M., 80.5 hours per week.

139. While gym users do their workout routines, there is nothing routine about endless research and typing. A more subtle way FCI Fort Dix denies prisoners the right of access to the courts is to provide a law library that is antiquated and dilapidated in physical structure; a law library that provides obsolete, antiquated and broken equipment, in 695 sq. ft. of space for 20 machines. The law library provides ten typing

stations for 2500 inmates. A reasonable person should find the ratio of 250 to 1 outrageous and unacceptable.

140. These ten typing stations provided are for the use of typewriters, not word processors. plaintiff genuinely doubts the court has seen a typewriter in the past 25 years. To compound the prisoner's situation, by the use of a typewriter, he must purchase ancillary equipment to make the typewriter operational. plaintiff must purchase a typing wheel, for $40.00, a typing ribbon for $4.00 and correctional typing ribbon for four dollars. The expense to make the typewriter operational is aggravated by the fact that malfunctioning typewriters frequently break the typing wheel and the typing ribbons are good for a maximum of twenty typed pages.

141. Plaintiff was only allowed to make those purchases once a week. Should plaintiff's wheel break the day after he shops, he must wait a week to make another purchase. when the BOP promised it would provide a typewriter, it implied a working typewriter. As the anyone can see, this is not accurate.

142. The ratio of inmates to computer (LEXIS) terminal does not fare much better. There are 15 computer terminals and the we find the ratio of 170 to 1 equally unacceptable. The law library discarded hundreds of law books within the past 12 months.' " where twenty or thirty prisoners, could access any number of the

hundreds of law books discarded, FCI,Fort Dix created a bottle neck with the installation of the 15 computer terminals. This created a scarcity that functionally deprives individuals of the resource.

143. A so subtle way FCI,Fort Dix denies plaintiff the right of access to the court is through the costs of copies. Because FCI,Fort Dix does not provide word processors, all typed work has to be copied or the original and only copy has to be mailed. Copies at FCI,Fort Dix are 15 cents each. plaintiff is confident copies at stationary stores are considerably less than 15 cents per page. [they are actually more in the 5 cent per page range] See Exhibit ( A ), a request for the U.S. Court,of Appeals for duplication costs. Not only is this 33% less than that at FCI,Fort Dix, the copies are also made for plaintiff.

144. Regarding postage, suffice it to say that when the court considers all of the above, plus postage, plaintiff's right of access to the court is cleverly obstructed, and complete. FCI Fort Dix further up ends plaintiff by only allowing the purchase of one book of stamps per week. Many legal parcels require more than one book of stamps, several books if using the USPS's certified mail system. The bottom line here is that not only are inmates impeded in their access to the courts, but the commissary make more money on them if they want to use the law

52

library.

145. At an average of $25,000 per inmate (and it's more than that for low security), the BOP receives about $110,000,000, and we can only imagine how that might be spent, as on unnecessary fencing maybe. Who knows how much money comes and goes at FCI Fort Dix, or how it's spent. Figures are not available, and if audits are conducted, this plaintiff has not heard of one. But plaintiff has been to this institution twice, and it is far worse the second time around, and certainly more corrupt.

146. Plaintiff can only compare it to what he has seen in the outside world, and how many stories of corruption are in the news, especially in government. Plaintiff alleges that the named defendants are engaged in an organized racketeering enterprise, and attempted to intimidate him to refrain from his informing even the United States Attorney General, the top law enforcement official in the country, and also a defendant herein.

147. Certainly much of what transpires in this enterprise is transacted through the mails and the wires, and in interstate commerce, and perhaps other potential informants are being harassed as plaintiff herein had been. But who will investigate the people charged with investigating. The BOP will not investigate itself, because it has failed to police itself.

53

WHEREFORE, plaintiff asks for damages in the amount of one million dollars for each of the four years he suffered at FCI Fort Dix, and treble damages for the RICO violation; or

In the alternative, an amount to be set by a jury.

Joint and several liability from the Defendants herein; and

Attorney's fees and costs of suit.

Respectfully Submitted,

Frank Dippolito
        Plaintiff, *pro se*

dated: APR. 1 9, 2014